## HORNOR, AS TRUSTEE VS. HANKS ET AL.

A judgment against a debtor is a lien only upon his own lands; and if an execution thereon be levied on the lands of another, it should be discharged ; and a purchaser under an execution so levied acquires no title, whether he has notice that the debtor has no interest in the lands, or not.

The right of a plaintiff must be adjudicated upon as it existed at the time of the filing of his bill ; and if he has a good cause of action, which had not then accrued, the bill cannot be maintained :   And it would seem that a court of chancery would

not allow a defendant to modify the relief to which the plaintiff was entitled when the suit was begun, by setting up as a defense a change of circumstances produced by the use of legal process or remedies after he is brought into court: So, if the defendant has a judgment against the plaintiff when the bill is filed, his case is not strengthened by a subsequent sale and purchase of the property in dispute under such judgment.

Where lands are levied upon and sold under execution, in which a third person as well as the judgment debtor has an interest, the presence of the third person at the sale, without giving notice of his interest, nor his bidding for the land, can affect his interest if the lands are purchased by one having notice thereof.

A non-resident creditor has his election to sue the personal representative of his deceased debtor in the State or Federal court, and prosecute his suit to judgment; but payment of such judgment in the federal court cannot be enforced by execution—it must, like all other claims against the estates of deceased persons, be classified in the Probate Court, and its payment enforced according to the administration law.

Where the creditor having obtained judgment in the Federal Court against the executors of his deceased debtor, and issued execution thereon, and at execution sale purchased and obtained the sheriff's deed for the lands of the deceased, the proceedings are not merely irregular, as in *Cummins vs. Adamson*, 5 *Eng.* 541, where a stranger to the execution became the purchaser, but his title is void and will be canceled by a court of chancery:

In such case, however, a court of chancery will decree a cancellation of the purchaser's title only on the terms that the amount due upon the judgment be paid; or that so much of the lands as may be necessary to pay such judgment be sold: and if the purchaser has sold any of such lands the court will not interfere with such sales, but make him account for the proceeds thereof.

The general rule is that a cross-bill must be restricted to the matters in the complaint, either to obtain the evidence of the complainant in defense, or a decree against him, or to obtain a decree against a co-defendant—but a cross-bill may, under special circumstances, be extended, to other matters in dispute between the parties than those mentioned in the bill; as where some of the parties are non-residents; or where the matter of complaint is the title to lands, and there are other lands, the controversy in reference to which is so connected with the subject of complaint, as to render it necessary to embrace them also in the settlement, to do complete justice between the parties.

*Appeal from Phillips Circuit Court in Chancery.*

Hon. CHARLES C. FARRELLY, Special Judge.

WATKINS & GALLAGHER and GARLAND for appellant.
We take the ground that Russell being a non-resident was

574        CASES IN THE SUPREME COURT

Hornor, as Trustee vs. Hanks et al.        [JANUARY]

not bound to follow the rules prescribed by the State Legislature in order to collect his demand against Ferebee. He had his remedies before him, either of which he was at liberty to pursue, and the election of one secured to him all benefits and rights he could possibly have had, by taking the other. On the same ground that a man in the State can sue either in the Circuit Court or in the Probate Court, Russell could sue and recover in the Federal or in the State Courts—*Madden ad. vs. State Bank*, 13 *Ark.*, 276 ; Russell as a non-resident had his forum, and was not to be circumscribed, or trammelled by the State laws so as to lose the benefit of that forum. It has been repeatedly decided that all laws passed by a State Legislature which attempted to restrict in the least the rights of a non-resident in this respect were void.

The party is free to elect, and when he elects he is bound by the choice—of course, this is natural and simple, and this point is settled beyond any kind of question in various adjudications of the Supreme Court of the United States. *Ross & al vs. Duval & al.*, 13 *Peters* 45 ; *Amis vs. Smith*, 14 *Peters*, 303. See also *Union Bank of Tennessee vs. Jolly's Adrs.* 18, *How.* 504; *Suydam as. Brodnax et al.* 14 *Pet.* 67–75 ; *Hyde vs. Stone* 20 *How.* 175 ; *Ableman vs. Booth* 21 *How.* 525. The only possible question is, had the United States Circuit Court the power to execute its judgment. Apart from the authorities directly in point, herein cited, it is a universal principle, that as execution is the fruit of the law, it follows as a necessary incident to the judgment, and is the essence of the jurisdiction of a court.

If the suit could have been brought in the Federal Court, regardless of the State laws, and judgment could have been rendered there, binding and operative, certainly the execution, levy and sale would follow as legal consequences. It mnst be conceded that as a judgment is rendered for certain purposes, every thing necessary to execute that judgment must follow. Unless a court has this power, it is really no court at all. *United States vs. Duncan et al., Hempstead C. C. Rep.*, 320, *and the very*

OF THE STATE OF ARKANSAS. 575

Term 1861.]                Hornor, as Trustee vs. Hanks et al.

*full notes there given* ; *Voorhies vs. Bank of United States,* 10 *Porter* 494 ; *Huff vs. Hutchinson,* 14 *How.* 586.

It is insisted, though, that Russell bought with notice of Hanks' rights ! Russell's answer denies this notice flatly, and comes, in its averments, directly within the rigid rules laid down on this subject in *Byers ad. vs. Fowler,* 7 *Eng.* 218. The acknowledgment of the instrument does not come up to the requirements of the law, and without the proper acknowledgment it is inoperative, *Main vs. Alexander* 4 *Eng.* 112 ; nor does any thing cure this defect so as to affect intervening rights of persons. *Blogg vs. Hunter,* 15 *Ark.* 246.

Hanks confesses he was present at the sale, and did not there declare, or make known his rights, but remained silent. This should, and by law must, be taken most strongly against him— it is in the strongest sense acquiescence on his part. He had it in his power to have protected himself, and as he did not then complain, he will not be heard to do so now. We hold Hanks is estopped by his presence at the sale, and failing to make known his claim, from now setting up his pretended rights. *Nixon vs. Carco,* 28 *Miss.* (6 *Cush.*) 114 ; *Corbett vs. Moncross,* 35 *New Hamp.* 99 ; *Shall vs. Biscoe,* 18 *Ark.* 142.

But the cross-bill is woefully defective, and under it the court could grant no relief at all. In the first place the different persons to whom Russell had sold some of the lands, and whose names are set forth in the answers filed by him, should have been made parties—and Russell expressly makes this objection, and it is one that can be made at any time during the progress of the cause, at the hearing, or here on appeal, if the defect be apparent ; *Story's Eq. Pls. sec.* 2 6 ; 1 *Peters Rep.* 306 ; *Baker vs. Biddle, Baldwin C. C.* 394. This objection is fatal to the cross-bill.

But the cross-bill shows plainly it departed entirely from the original bill, and introduced new matters of litigation, in no wise connected or dependent on the matter set up in the original bill. The cross bill being merely a mode of defence, and auxiliary to the original bill, it could not introduce new mat-

576          CASES IN THE SUPREME COURT

Hornor, as Trustee vs. Hanks et al.          [JANUARY

ter, and all relief prayed for as to the lands not mentioned in the original bill, ought to have been denied. As to the lands not named in the original bill, the cross bill was strictly a new suit, and to that extent was not properly examinable on the hearing of this suit. *3d Daniel's Ch. Pr.* 1746 ; *May vs. Armstrong,* 3 *J. J. Marsh.* 262 ; *Daniel vs. Morrison,* 6 *Dana*"186 ; *Galatin vs. Erwin,* 1 *Hopkins* 48 ; *Story's Eq. Pls. Sec.* 401.

HEMPSTEAD AND STILLWELL & WOODRUFF, for appellees.

Although Russell denied notice of the existence of Ferebee's obligation to reconvey, he admitted that he knew of its existence at the *time of his purchase.* 16 *Ark.* 543, *Byers & Patterson vs. Engles.*

What if Hanks was present at the sale, and gave no notice of his claim *then—Russell* knew of it *before,* and it is not material whether other people present were informed or not ? To entitle himself to protection, he must not only have been without notice at the *time* of his *purchase,* but at the time he *paid* the money and *received* his *deed.* 7 *Eng. R.* 218, *Byers et al. vs. Fowler.* Besides, *Ferebee's* bond, though informally acknowl_s_ edged, was admitted to record; and the act of 5th January, 1843, curing defects in recording, was in force months before *Russell's* purchase, and he was bound by it, if he had not actual notice— which he had. *Main vs Alexander,* 4 *Eng* , has no bearing. There is no mortgage here, and a different statute applies. 16 *Ark.* 543. *Blogg vs. Hunter,* has as little, for *Russell* had no right intervening before the date of the act, 5th January, 1843.

That *Russell* was not obliged to submit his claim to the probate court in the first instance for adjudication is admitted. That he might sue in the federal or circuit courts of the State, is conceded. But those courts could not go further and invade the jurisdiction of the probate court, trample the laws of the State under foot, and appropriate assets appropriated by law to the payment of claims of a higher class, to the payment of his. After obtaining his judgment he might have presented it to the

probate court, and it would have been, under its direction, paid when it appeared there were assets.

That non-residents are entitled to the same facilities for collecting money due them, as our own citizens have, is not controverted. But that they have any other, or that it is in the power of the federal legislature to confer upon them others, is not conceded. Nor is such principle asserted in the cases of *Suydam vs. Brodnax, Union Bank vs. Jolly's ad.; Ross et al. vs. Duval et al., Hyde et al. vs. Stone,* cited by appellant. The United States vs. *Rector's administrators, Hemp. R., p.* 320, is entitled to high respect, but it does not furnish a rule for decision in this court. The courts of the States are the proper expounders of the State laws, and it is the practice of the courts of the United States to adopt the settled construction of such laws by the courts of the State.

*Cummins ad. vs. Adamson et al.,* 5 *Eng.,* sustains our position fully. True it is, that the *fi. fa.,* issued upon the judgment of the circuit court, was declared irregular, not void, and the title of the purchasers at the execution sale declared valid. But it was upon the ground that they were not parties to the judgment and process, and without notice of the irregularity. Did *Russell* occupy the same position? Was he without notice of the irregularity? Surely not. He was the plaintiff in the execution as well as purchaser at the sale.

It is objected that the cross-bill departed from the original bill; that as to the lands mentioned in the cross-bill, not mentioned in the original bill, it was a new suit; that as to the 769 72 100 acres mentioned in the original bill, the complainant in the cross-bill might have been fully protected by decree upon the original bill.

It is, and always has been, the universal practice, in this country, for courts to discourage a multiplicity of suits. Wherever it can be done, without injustice, parties are not only encouraged, but required, to bring the whole matter of controversy, growing out of the same subject, into, and have it settled, in one suit. Where a variety of interests have sprung up, and a

37

number of persons become interested, who are not parties to
the original suit, a defendant will not always be permitted to
bring them in by cross-bill ; but the reason of the rule has no
application here.    No new parties were brought in ; the par-
ties to the original bill, and no others, were parties to the cross-
bill.    See *Story's Eq. Pl.* 392, *note* 1 ; *Ark. Dig.* 230 *Sec.* 32,
35.

Mr. Justice FAIRCHILD delivered the opinion of the Court.

This suit has been pending since the 22d of March, 1848.    On
that day, Fleetwood Hanks filed his bill on the chancery side of
the Circuit Court of Phillips county against Robert M. Ferebee,
the Trustees of the Real Estate Bank, and William Russell, to
obtain partition of certain lands which Hanks alleged he and
George W. Ferebee had formerly held in common, and which
he insisted were still subject to partition ; himself being enti-
tled in equity to an equal undivided part thereof, the other part
belonging to William Russell, who claimed to be the purcha-
ser of the one half interest of George W. Ferebee in the lands
at a judicial sale, or to Robert M. Ferebee the heir of George
W. Ferebee, who was dead when the bill was filed.

It seems to be unnecessary to take any trouble with the Real
Estate Bank branch of the case.    For although the lands in
question were transferred by Hanks to George W. Ferebee to
enable him to pledge them to the Bank for stock subscription,
and although Ferebee did mortgage these and other lands to
the Bank, upon which was awarded to him the maximum of
stock allowed to a subscriber, Ferebee, as between himself and
Hanks, was still the owner of but an undivided half of the
lands, and also held the same portion of the stock awarded to
him in trust for Hanks.    And out of three hundred shares of
stock, which Ferebee acquired, two hundred and sixty-two of
them were by his executors transferred to Perry W. Porter,
which transfer seems to have been properly made on the books
of the Bank, to have been accepted by it, and the transferred
shares were secured by the mortgage, by Porter, of other lands

to the bank.   The Trustees of the Real Estate Bank do not seem to have defended the suit, nor has any one representing its interest interfered in the litigation.   Hence, whatever liability may rest upon the lands to the State, or the bond-holders, upon Ferebee's mortgage, as covering the thirty-eight untransferred shares of stock, or otherwise, we may follow the example set by the litigants and the court below, in considering the contest, as to the lands mentioned in the original bill, as one not concerning the Real Estate Bank.

Between Hanks and Robert M. Ferebee there was no contention as to the right of the former to an undivided one half of the lands, of which Hanks sought a partition by his bill ; nor is any opposition made to the relief Hanks prays for, by Margaret F. Neely, who has succeeded to the rights of Robert M. Ferebee, and who represents the interest of George W. Ferebee.   But Russell objected to the right claimed by the bill, that Hanks, by his deed to Ferebee, divested himself of all title to the lands, so that Russell, as a purchaser of them at an execution sale, acquired the full title against any claim that Hanks should be allowed to make.

Upon the 29th June, 1837, the day after Hanks had conveyed the lands to George W. Ferebee, as above mentioned, the latter executed a writing under seal, in which he recited that the deed had been made to him by Hanks that the lands might be used for their joint benefit in obtaining stock in the Real Estate Bank, and that he was bound to transfer to Hanks one half of the lands and proceeds of the stock subscription.   This paper was filed for record the first day of September, 1843.   The execution under which Russell bought the lands, was levied upon them on the 12th June, 1843, but the sale was not made till the 30th of September, 1844.   Russell admits that he had knowledge of the writing executed by Ferebee, recognizing the right of Hanks in the lands, which knowledge was acquired by him between the times of the levy and sale of the lands.

A judgment against Ferebee was a lien only upon his own lands ; when a levy was made of an execution against another

person upon the lands of Hanks, it should have been discharged ; and if the title depended upon notice, a purchaser with notice could not obtain any title. *Byers vs. Engles* 16 *Ark.* 543; *The State vs. Swigert* decided at the present term.

But although the bill charges notice of the interest of Hanks upon Russell, both constructive by the record of the writing, and actual, which latter sort of notice is admitted in the qualified way above stated in the answers of Russell, the question is not one of notice, but of the interest of Hanks, at the time of the levy and of the sale. The process against Ferebee's executors could not affect the right of Hanks. He may concede that Russell by his purchase acquired the interest of Ferebee in the lands, but may successfully deny that his own title shall be affected by proceedings against another person.

In this condition the suit was as between Hanks and Russell, but at the May term, 1853, Russell set up in bar of the claim of Hanks to a partition of the lands, that on the 30th of March, 1841, he obtained a judgment against Hanks in the Circuit Court of the United States for the district of Arkansas, that an execution issued upon that judgment, was levied on the lands described in the bill, on the 29th May, 1841, and that on the 5th of February, 1849, the lands were sold under the execution to Russell, whereby he acquired all the interest of Hanks in the lands, which is evidenced by a Marshal's deed that was afterwards executed and delivered to him. Russell was apprised of the object of this suit before his attempt to subject the lands to his judgment against Hanks was accomplished by the sale of the 5th of February, 1849. He appeared to the suit, at the May term, 1848 of the court, by filing a demurrer to the bill and at the May term 1851, he filed an answer, in which he made no mention of his succession to the interest of Hanks. At the May term 1853, he first presented his purchase under his execution against Hanks as a defense to the bill.

The law is expressly written, that the right of a plaintiff must be adjudicated upon as it existed at the time of the filing of his bill. *Adams Eq.* 413; *Barfield vs. Kelly* 4 *Russ.* 359.

OF THE STATE OF ARKANSAS. 581

TERM, 1861]          Hornor, as Trustee vs. Hanks et al.

And this court has decided that where a bill disclosed a good cause of action, but which had not accrued when the bill was filed, the bill could not be maintained. *Phebe vs. Quillin* 21 *Ark.* 499. And it would seem to be against the policy of a court of chancery to allow a defendant to cut off, or to modify the relief to which the whole case may show the plaintiff to have been entitled upon the condition of the case when the suit was begun, by the use of legal process or remedies after the defendant is brought into a court of equity, there to make his defense. For the object of a chancery suit is to administer entire justice, by a settlement of the whole controversy between all the persons affected by it, and this it can do only by engrossing the consideration of all the points of prosecution and defense that may be allowed to the respective parties. Hence Russell would have done well to have defended the bill of Hanks upon its deficiencies, and his own rights, as they were when the bill and his answer were filed. He could not of course have been deprived of any benefit that might attach to his levy of the lands made before the beginning of the suit; neither, on the other hand, does it follow that his execution sale against Hanks can assist his defense here, though he may be guiltless of a contempt of court, in completing, by sale, the inchoate claim which was dependent upon his levy. Russell might have set up the lien of his judgment, or of his levy, as a defense, which would have been as effectual in a court of chancery as their merger by sale during the progress of a suit against him for the lands, and he would have occupied an attitude less exceptionable before the court.

We have seen that the levy of Russell's execution against Hanks was made upon the 29th May, 1841, and that the sale took place on the 5th of February, 1849. Any favorable effect that would be produced in this case from these legal proceedings of Russell, must arise from the sale, for the durability of the levy cannot be sufficient to uphold a levy lien for nearly eight years. Nor did Russell after his alleged purchase of the interest of Hanks, make the same known to the court with promptness;

making no mention of it, till in his answer filed the 27th May, 1853. In that answer, he sets up mutual releases and agreements executed by Hanks and himself, produced as exhibits H. No. 3, and H. No. 4, as barring Hanks from any right to the lands embraced in his bill, when those papers could not be construed to relate to the sale of such lands as had been sold on the 30th of September, 1844, as the property of Hanks. And the answer of Russell to the supplemental bill of Hanks, which was filed on the 27th of November, 1855, pleads an exoneration from the stipulation contained in exhibit H. No. 4, not further to molest Hanks upon Russell's judgments against him in the Federal Court, on account of previous violation by Hanks of his agreement contained in exhibit H. No 3. Upon the subject of the violation by Hanks of his agreement, there is nothing to guide us, the record containing nothing but allegation against allegation ; while it is manifest that Russell's agreement of exhibit H. No. 4, was violated by his sale of the lands in question, on the 5th of February, 1849, by means of an execution against Hanks, unless Hanks had before that time discharged Russell from the engagement contained in exhibit H. No. 4, by his disregard of his own stipulations as set forth in exhibit H. No. 3.

Hanks had once a right to a partition of these lands: that is unquestioned by Russell ; and when the impeachment of that right by Russell amounts only to an averment that Hanks has been divested of his right, we must uphold the right.

Although Hanks may have been present at the sale of these lands on the 30th of September, 1844, Russell, from knowing the claim of Hanks, cannot reap any benefit from his silence, for what would have been announced by Hanks concerning the claim, was already within the knowledge of Russell. Hanks had the same right as any body else to bid upon the offered sale of Ferebee's interest in the lands, although he denies making any bid for them. From both of these facts, if they are such, Russell had no reason to infer that Hanks had abandoned his claim to the lands. Hanks is not brought within the rule

recognized by this court in *Shall vs. Biscoe et al.* 18 *Ark.* 165, and applied in other cases cited by the counsel for Russell, which is an elementary principle pervading all the cases upon the subject.

We approve of so much of the decree of the court below as awarded a partition of the lands mentioned in the original and supplemental bills, on the ground that the plaintiff was the owner of an undivided one-half of the lands.

In the controversy between Margaret F. Neely and Russell, growing out of the cross-bill of Robert M. Ferebee, two main points are to be considered ; whether the cross-bill shall be allowed to include other lands than those which are embraced in the original bill ; and whether Russell obtained title to the lands of George W. Ferebee by his purchase of them under execution, which will be good against the effort of the cross-bill of Robert M. Ferebee to have such title canceled.

The latter point presents the important question of the case, and will be first taken up, for if the title of Russell be unimpeachable in this proceeding, Mrs. Neely has no claim upon any of the lands involved in the original or cross-suit, and the scope of the cross-bill need not be considered.

In a suit begun by Russell against the executors of George W. Ferebee after his death, judgment was rendered in favor of Russell in the Circuit Court of the United States for the District of Arkansas, on which executions were issued, and large quantities of land were sold under the executions, of which Russell became the purchaser.

It was contended by Robert M. Ferebee, and is now maintained by Mrs. Neely, the successor to his claim, that the executions and sales had thereunder were illegal, that the titles procured by Russell witnessing his purchases at the sales are worthless and fraudulent against the inherited title to the lands which the law cast upon Robert M. Ferebee, as the heir of George W. Ferebee. · The executions and proceedings dependent upon them are alleged to be irregular, because they violated the letter and policy of our administration laws ; that the judgment

584    CASES IN THE SUPREME COURT

Hornor, as Trustee vs. Hanks et al.    [JANUARY]

obtained by Russell could be collected, only by being brought within the jurisdiction of the Probate Court, there to be classified in its legal order, as an allowed demand against the estate of George W. Ferebee, and to be paid out of the assets of the estate, under the direction of the Probate Court, in accordance with the requirements of the administration law, and as other debts of the same class.

This is clearly the law that controls demands against deceased persons, that had not become liens upon specific property, before the death of the debtor. When a man dies, his estate is subject to the payment of his debts; but under our system of law, the debts must be paid under the direction of the Probate Court, in the order in which they are there classed, and all debts of the same class must be paid together, either in whole or in part. *Bomford vs. Grimes,* 17 *Ark.* 571; *Clark vs. Shelton,* 16 *Ark.* 483.

A creditor need not repair to the Probate Court to have his demand passed on there, he may proceed by suit in the Circuit Court, or other court of competent jurisdiction, obtain his judgment, which will be taken as an established demand, ready for classification by the administrator, and for payment in its rank, under the order of the Probate Court. *Outlaw vs. Yell,* 5 *Ark.* 472; *Ryan vs. Lemon,* 5 *Eng·* 78; *Clark vs. Shelton,* 16 *Ark.* 480· And he may do this because the law allows it to be done; yet in every step of his proceeding he must conform to all legislative requirements. It has been expressly decided by this court, that a judgment in the Circuit Court does not confer authority upon the plaintiff to collect the judgment in the ordinary mode, by the process of the Circuit Court. The judgment, though it has settled the existence of a demand, has completed its allowance, and has imposed upon the administrator the duty to classify it, and cause it to be recorded in the Probate Court, cannot be allowed to sweep its way through an estate, appropriating its assets in disregard of the existence of demands that are more worthy in the eye of the law, without notice of claims that are upon an equal footing, from being placed in the same

class. *Adamson vs. Cummins*, 5 *Eng.* 541. The policy of our law, and the ill consequences that would attend a departure from it, are sufficiently set forth in that case, and we need say no more than to express the continued assent of the court to the result reached in that case, that judgments of the Circuit Court against executors or administrators, on debts due from deceased persons, can support a compulsory satisfaction, only by being brought under the administration of Probate Courts like other demands against estates, that they cannot be enforced by ordinary existing process, as if rendered against living persons.

Such is the law with regard to judgments of our own courts, and we know of no principle that requires a different rule to be applied to judgments of the Federal Courts. They may not be, like the State Courts, subject to statutory modes of proceeding, but their judgments are of no higher grade than ours; and no constitutional or paramount law gives to creditors out of the State greater privileges in the distribution of estates than creditors in the State enjoy. Federal judgments are within the reason of the law, the unrestrained execution of them by the courts, as if the debtors were alive, would induce the evils, that the law designed to prevent in placing estates within the custody of the Probate Courts to be applied to debts in the way directed by our administration law. And they are also within the letter of the law, as expounded by the highest Federal Court.

In Mississippi, the jurisdiction of the courts exercising Probate authority does not attach to the estate of a deceased person, till it is found to be insolvent, when its assets are equally distributed between all the creditors.

But, in accordance with the Mississippi statute, the Supreme Court held that a judgment of the District Court of the United States given before the estate was declared insolvent, could not be satisfied out of the assets by execution. The following extract from the opinion of the court, plainly shows the principle of its decision : " As, therefore, the judgment obtained by

586 CASES IN THE SUPREME COURT

Hornor, as Trustee vs. Hanks et al. [JANUARY]

the plaintiffs in the court below, did not entitle them to a prior lien, or a right of satisfaction in preference to the other creditors of the insolvent estate, they have no right to take in execution the property of the deceased which the Probate Court has ordered to be sold for the purpose of an equal distribution among all the creditors. The jurisdiction of the court has atttached to the assets ; they are *in gremio legis*. And if the Marshal were permitted to seize them under an execution, it would not only cause manifest injustice to be done to the rights of others, but be the occasion of an unpleasant conflict between courts of separate and independent jurisdiction." *Williams vs. Benedict*, 8 *How*. 112.

In the above extract, all is said that need be said to show the reasonableness of applying to the judgments of the United States Courts the same rule that we enforce upon judgments of our own courts. And we do not understand the succeeding qualifying remarks to be opposed to our system of distribution of assets, for this does not attempt to exclude residents of other States from obtaining judgments in the United States Courts, but places them only upon the same level with our own judgments. If our statute considers all estates as insolvent, or likely to be, or treats them as such until the contrary is shown, they are entitled to the same protection from non-resident interference, that the estates in Mississippi are, that are saved by its law from being seized in a race of diligence for the satisfaction of the whole of one debt, to the loss of all other debts. To the same effect are *Peale vs. Phipps*, 14 *How*. 374 ; *The Bank of Tennessee vs. Horn*, 17 *How*. 160.

We are not the constituted judges of the good policy of our laws, yet we may be indulged in the remark, that its wisdom cannot be impeached, that its equity is apparent. And though the decisions of this court are our highest and only controlling authority, in construing our own statutes, we are glad to see that *Adamson vs. Cummins* falls within the principle distinctly enunciated by the most august tribunal of our country

To the same effect are the decisions in Mississippi upon its statute, like ours in principle.

Except the case of *The United States vs. Drennen, Hemp. R.* 320, we have not found or been referred to any authority that sustains the executions of Russell. For the cases of which *Suydam vs. Brodnax*, 13 *Peters* 67, and *Hyde vs. Stone*, 20 *How.* 170, may be taken as instances, have relation only to the right of suit, or to affording redress to suitors in ordinary cases, and do not deny the right of the States to compel all the creditors of an estate to be placed upon an equitable foundation, securing an equal partition of the assets among all established claims according to a priority that shall depend upon the worthiness of the claims, and not upon the residence of the claimants.

Our administration law is not within the observation of *Voorhees vs. The Bank of the United States*, 10 *Peters* 449, and *Huff vs. Hutchinson*, 14 *How.* 588, as it does not interfere with the plaintiff in getting his judgment, and does not take away his right to process for its execution, although it changes the mode of execution, by remitting the judgment to the Probate Court, and to satisfaction under its rules, instead of permitting the ordinary legal process.

The case from Hempstead's Reports, to which we have been cited, does contain a sound exposition of our statute.

A court does not cease to be a court, because it cannot by its own power execute its judgments. This prohibition rests upon our own courts of superior jurisdiction with regard to their judgments against the personal representatives of deceased persons. But in considering the premises upon which judgments are given, and in giving them, the courts act as courts, are such in the highest and most appropriate sense. The rendition, more than the execution of a judgment, is an exercise of judicial power. The argument for Russell, and the United States vs. Drennen, would make a court consist mainly in the discharge of ministerial offices, making them as necessary to the constitution of a court, as its judicial functions. The argument is unsound, the case is not law.

588 CASES IN THE SUPREME COURT

Hornor, as Trustee vs. Hanks et al. [JANUARY

It is insisted for Russell that, though the executions under which the lands included in the cross-suit were sold, were irregular, the sale must not be interfered with in this suit; that the proceedings were not reviewed by appeal, or writ of error, and cannot be attacked by this litigation.

A bill in chancery prosecuted for the single purpose of canceling titles founded upon irregular sales, is not an indirect or collateral proceeding. This case has no analogy to *Scott vs. Pleasants*, 21 *Ark.* 364, and the numerous cases that hold a judgment or decree good against an objection made in a collateral proceeding.

Nor does Russell occupy the situation of the purchasers in *Adamson vs. Cummins.* Their title was maintained because they were unconnected with the irregular execution that was quashed. If they had been, like Russell in this case, the promoters of the illegal proceeding, the sale as well as the execution would have been quashed; they would have been subjected to the same decision that we make concerning Russell: that his executions were irregular, that they are questionable by direct proceeding against them in chancery, and that he derived no title to the lands he bought at the sales, which he can hold against those that are entitled to the estate of George W. Ferebee.

The order canceling the titles of Russell must except the lands purchased by him under decrees for the foreclosure of two mortgages given to him by George W. Ferebee to secure the payment of part of the debts on which Russell's judgment was obtained. These lands are those conveyed to Russell by John S. Horner, commissioner, upon the 23d of April, 1849, and those conveyed to him by William Harvick, commissioner, on the 3d of February, 1846.

Upon these lands mortgaged to Russell, he had a specific lien, which George W. Ferebee's death did not displace. Russell had a right to enforce that lien without application to the Probate Court, and the title he obtained to the lands under the mortgage sales is good.

We assent to the proposition, that the heir of George W. Ferebee cannot cancel Russell's title to the lands, without paying his judgment.

The judgment was an allowed demand; it was the duty of the executors of George W. Ferebee to classify and list it in the Probate Court, among the ascertained claims against the estate. The estate has been discharged from the Probate Court; the property divested from Russell's trustee goes to the grantee of George W. Ferebee's heir, and it is not equitable for her to have it, and for the beneficiaries of Russell's trust to lose the lands, without being indemnified by payment of the judgment, to whose satisfaction the lands were applied.

Such is the principle of certain decisions of the Supreme Court of the United States, which do not conflict, but were argued as conflicting with the irregularity of the Marshal's sales. *Un· Bk. Ten. vs. Jolly*, 18 *How.* 507; *Green vs. Creighton*, 23 *How.* 107.

Russell is not to be considered as a trespasser, but rather as a trustee, holding the lands charged with the payment of his judgment. It does not appear that he acted corruptly, or more exactingly than might be expected of a diligent creditor. He avers in his answer that he only took the course pointed out by his counsel, that he did not interfere in the direction of the coercive measures against the lands, and only did what he thought and was advised he had a right to do. The unsettled condition of the law and practice in our State Courts, and the doctrine of the Federal Court in this State, as asserted in *The United States vs. Drennen*, make the answer reasonable in this respect.

Russell will be credited with his judgment and its accruing interest. He will also be credited with the amount he paid to the United States for the lands marked No. 5, in his answer to the cross-bill setting forth the lands bought by him under the executions against George W. Ferebee, from which it appears that Ferebee claimed those lands under a Cherokee pre-emption,

which did not hold them, and that Russell was obliged to enter them. On this credit six per cent interest will be allowed.

Russell will be charged with the sums he bid for the lands and town lots he bought at the two mortgage sales.

And as there will be a large balance on the judgment, after taking into account the prices which he has realized from the sale of lands not included in the mortgages, he will also be charged with those prices, taking the prices in his answer as the true price and value of the lands sold.

But from the price of survey, No. 2391, sold to the Martins for $9,800, a deduction of 498 70-100 dollars, with ten per cent interest from the 23d of September, 1845, to the 3d of February, 1846, must be made, which amount Russell was obliged to pay to Cephas Knowlton, to remove an incumbrance upon the lands in the survey.

Russell will also be charged with the value, in February, 1850, of the north-east fractional quarter of section twenty-nine, township two south, range four west, which he then conveyed to James M. Williamson for a price not stated ; with the value of lot No. 2, in Helena, on the 1st February, 1850, which Russell donated to the Presbyterian Church, and with the value of lots 69 and 71, in Helena, at the beginning of this suit.

The residue of the amount due on the judgment, which is likely to be about twenty-five thousand dollars, will be a charge upon the lands, and Mrs. Neely will be entitled to have them divested out of Russell's trustee, and to have them vested in her, on payment of what is due upon the judgment, or to have the lands or enough of them sold to pay the amount, and to hold the overplus of lands, or of their proceeds, as the grantee of Robert M. Ferebee, or if she declines the offered relief the cross-bill of Robert M. Ferebee as adopted by her will be dismissed.

This does not include the lands which Russell bought at the mortgage sales, or those which he sold, as specified in his answer. As to them, the cross-bill of Robert M. Ferebee, and the dependent bill of Neely and wife are dismissed.

The conclusion upon the execution sales would be without

effect in this case, except upon the lands subject to partition between Hanks and Mrs. Neely, unless the cross-bill can extend beyond those lands. For Russell, it is contended that the cross-bill must be confined to the lands that are the subject matter of the original suit. And such is the general law. *Story Eq. Plg.* s. 401; *3 Day Ch. Pr.* (*Perkins Ed.*) 1746; *Galatier vs. Erwin, Hopks. Ch. Rep.*

The reason of the law is to confine suits within reasonable bounds, and to do this, the litigation is restricted to the matter of the complaint, as otherwise an indefinite number of subjects of controversy might be brought into a case, delaying the suit and burdening it with costs, not appertaining to its subject matter, and perplexing the court.

More often than otherwise, a cross-bill is to obtain discovery from the plaintiff of facts contrary to, or different from those stated in the bill, but concerning its matter; or to obtain a decree against the plaintiff in the original suit, and the authorities refer to this sort of cross-bill, unless special mention is made of a cross-bill, filed to obtain a decree against a co-defendant. This latter sort of cross-bill is as well grounded in practice as the other, although it partakes somewhat of the nature of an original bill against the co-defendant, it being necessary to compel an answer from him by process, that not being necessary in this State as against the plaintiff in the original suit. *Walker vs. Byers,* 14 *Ark.* 262; *Josey vs. Rogers,* 13 *Geo.* 481.

As against a co-defendant, a cross-bill is not a defense to the original bill, and thus loses the most striking characteristic of a cross-bill. *Anderson vs. Ward,* 6 *Mon.* 420.

There would be but little difficulty on this point, in the case before us, if the parties, made defendants to the cross-bill, can be held to waive the objection to its scope. For Hanks makes no objection to the cross-bill being entertained, though the effect of it has been to overshadow the original suit; and Russell comes up without hesitation to the fullest possible defense against all that is charged, or can be inferred from the cross-bill. It is his copious documentary defense to the cross-bill, that has

592          CASES IN THE SUPREME COURT

Hornor as Trustee vs. Hanks et al.          [JANUARY

swelled the case to such unwieldly propositions. If he, or if Hanks, had called upon the court below to have confined the case to the lands in which Hanks had the interest, alleged in his bill, it would have been the duty of the court to have sustained the desired restriction. But Russell not only answered the cross-bill fully, but he first brought the fact into the case, that his purchases extended to other lands of Ferebee, than those that were the subject of Hanks' complaint. This was done in his two answers to the original bill; and the cross-bill is only an amplified specification of what the answers stated in a comprehensive way.

Still we do not say that a cross-bill, by the acquiescence of parties, may have indefinite extent, for the books seem to imply that there is a want of power to make a decree upon matters unconnected with the original suit.

A critical examination of the authorities will, however, confine the general expression to cases where parties have made the proper objection at the proper time, or where the cross-bill concerned only the plaintiff in the original suit, when it was a pure defense, or when the matters in the cross-bill were entirely disconnected from the subject of the original bill. And there will be found authority to show that this confinement of the cross-bill to the matter of the original bill, is only a usual, or rather is not a universal quality. As in *May vs. Armstrong*, 3 *J. J. M.* 262, after stating the law in the general terms in which it is mostly found, it qualifies the restriction by making it inoperative, if " there exist some special circumstances, such as insolvency, non-residence. &c., which would render it necessary in order to avoid irreparable injury. *     * ·     *     * The cross-bill must relate exclusively to the subject matter of the bill, and things connected therewith, and foreign matter cannot be introduced unless under special circumstances." The same qualification is contained in the Georgia case, already cited upon another point. *Josey vs. Rogers*, 13 *Geo.* 482.

Russell is proved to have been a non-resident, and that is one of the standing facts, classed by the authorities as among the spe-

cial circumstances that may remove the general rule. Yet we place this matter upon another, and we think higher ground. The matters of the cross-bill are not unconnected with the matter of the original bill. That relates to certain tracts of land, and Russell and Robert M. Ferebee were called to answer, as owning or claiming the half of the lands the plaintiff did not claim. Russell appeared, and asserted his claim to the lands as a purchaser of them at an execution sale. Ferebee appeared and claimed the title of Russell. But according to the principle of this opinion and of the argument for Russell, he was not entitled to all the lands Russell bought under executions against the assets of George W. Ferebee, without paying Russell's judgment. That principle would have required the part of the lands to be partitioned between Ferebee and Hanks, to have been charged with their ratable part of the amount due Russell upon the judgment, and thus the whole matter that has been under consideration in the cross-bill, as extended to all the purchases of Russell, would necessarily have been brought under review, to ascertain the charge upon Ferebee's half of the lands mentioned in the original bill. The litigation, in its subjects of enquiry, would have been as extensive as it has been. There is no propriety in the decree being narrower than the requisite subjects of examination and controversy between parties already before the court. From this cause, from the claimant of all the lands being the same as the claimants of the half of the lands Hanks did not claim, from Russell claiming all the lands under the same title, and from Ferebee's deducing them all as his by descent, we decide that the matter of the cross-bill is not foreign to that of the original bill. Though more extensive, it grew out of the matter of the original bill. *Daniel vs. Morrison* 6 *Dana.* 187 .

Even if there had been no cross-bill filed, we think the court might well have regretted losing the opportunity of settling a controversy that was so deeply involved in the enquiries which must have been made to deal out equity with respect to the lands of the original bill.

When necessary, the court will order a cross-bill to be filed

38

to insure a complete determination of the matters involved in a suit.   2 *Madd. Ch.* 433.

The following is apposite to this case, and we think decisive of the propriety of the cross-bill : "Upon hearing a cause, it sometimes appears that the suit already instituted is insufficient to bring before the court all matters necessary to enable it fully to decide upon the rights of all the parties.   This most commonly happens where parties in opposite interests are co-defendants, so that the court cannot determine their opposite interests upon the bill already filed, and the determination of their interests is yet necessary to a complete decree upon the subject matter of the suit.   In such a case, if upon hearing the cause the difficulty appears, and a cross-bill has not been exhibited to remove the difficulty, the court will direct a bill to be filed, in order to bring all the rights of all the parties fully and properly for its decision, and will reserve the directions or declarations, which it may be necessary to give or make touching the matter not fully in litigation by the former bill, until this new bill is brought to a hearing." 1 *Smith Ch. Pr.* 460.

Upon this, the most difficult point of this difficult case, we maintain the cross-bill to the extent it was presented and defended, and decreed upon in the court below.

The decree of the Circuit Court of Phillips county sitting in chancery is reversed, and a decree must be made in this court, in conformity to this opinion, which will be remanded to the court below for execution.   Let each party pay one-half the costs in this court, and the costs of the further execution of the decree, the costs in the court below to remain as provided for in its decree.